1  D. BRADLEY KIZZIA (admitted *pro hac vice*)
2  KIZZIA & JOHNSON PLLC
3  1910 Pacific Ave, Suite 13000
   Dallas, TX  75201
4  Telephone:    (469) 893-9940
   Facsimile:    (214) 451-0165
5  Email:        bkizzia@kjpllc.com
6  DAWN M. SMITH, SBN 222481
   SMITH CLINESMITH LLP
7  325 N. Saint Paul Street, 29th Floor
   Dallas, TX  75201
8  Telephone:    (214) 953-1900
   Facsimile:    (214) 953-1901
9  Email:        dawn@smithclinesmith.com

10 Attorneys for Plaintiff
11 SNAPKEYS, LTD

12

13                 UNITED STATES DISTRICT COURT

14               NORTHERN DISTRICT OF CALIFORNIA

15                     SAN JOSE DIVISION

16 SNAPKEYS, LTD.,                    )   CASE NO.:  5:19-cv- 2658-LHK
                                      )
17                  Plaintiff,        )   **Plaintiff's Third Amended Complaint**
                                      )   **and Jury Demand for:**
18      v.                            )
                                      )   1)  **Breach of Non-Disclosure**
19 GOOGLE LLC,                        )       **Agreement**
                                      )   2)  **Conversion**
20                  Defendant.        )   3)  **Violation of the UCL**
                                      )
21                                    )   **JUDGE:    Honorable Lucy H. Koh**
                                      )
22                                    )
                                      )
23 _____)

24

25

26

27

28

Now comes Snapkeys Ltd. ("Snapkeys"), and files this, Plaintiff's Third Amended Complaint complaining of and about Defendant Google LLC. ("Google") and, in accordance with the Court's Order of March 4, 2020 (Doc.54) that dismissed Plaintiff's claims against Defendant for fraud and breach of the implied covenant of good faith and fair dealing with prejudice, and subject to such Order but without waiving its contrary position thereon with which Plaintiff respectfully disagrees, files this Third Amended Complaint for remaining causes of Action and would respectfully show unto the Court the following:

## PARTIES

1. Plaintiff Snapkeys Ltd. ("Snapkeys") is a foreign limited liability company registered under the laws of the State of Israel, with its principal place of business in the State of Israel.

2. Upon information and belief, Defendant Google, LLC. ("Google") is a corporation organized under the laws of the State of Delaware with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google does business in the Northern District of California. Defendant Google has entered and made its appearance herein.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over the causes of action alleged in this Complaint pursuant to 28 U.S.C. § 1332(a). This Court has proper jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(2), because this suit is between a citizen of a domestic state (Defendant Google), and a citizen of a foreign state (Plaintiff Snapkeys).

4. Additionally, the amount in controversy exceeds $75,000 because Plaintiff is entitled to a significant amount of economic and non-economic damages including but not limited to lost investors, lost business opportunities, and two prototypes. This Court has supplemental jurisdiction over the state law claims alleged in this action, pursuant to 28 U.S.C. § 1367(a), because these claims are so intimately related to claims in the action exclusively within the

1    Court's original jurisdiction that they form part of the same case or controversy under

2    Article III of the United States Constitution, and because these claims arise out of the same

3    nexus of facts and events.

4

5    5.   Venue is proper in the Northern District of California under 28 U.S.C. § 1391(c)(2) because

6         the Defendant resides in the Northern District, maintains its principal place of business in

7         the Northern District, and the Northern District is where a substantial part of the events or

8         omissions giving rise to the claim occurred, and is therefore subject to personal jurisdiction

9         in this District. Venue is proper in this Division pursuant to Local Rule 3-2(e) because this

10        action arises in the county of Santa Clara, where Google maintains its principal place of

11        business. Furthermore, Venue exclusive to Santa Clara County, California as dictated

12        within the parties' Non-Disclosure Agreement, an agreement which forms the basis of

13        many of the claims and causes of action alleged in this lawsuit.

14

15   6.   This Court has personal jurisdiction over Google pursuant to Fed. R. Civ. P. 4(h), Fed. R.

16        Civ. P. 4(k)(1), and under Sections 410.10 and 416.10 of the California Code of Civil

17        Procedure. Google has conducted and does conduct business within the State of California

18        and within this judicial district. Furthermore, Google, directly or through intermediaries,

19        makes, distributes, offers for sale or license, sells, and advertises its products and services

20        in the United States, the State of California, and the Northern District of California, and

21        maintains its principal place of business in California.

22                                          **BACKGROUND**

23   7.   Snapkeys Ltd. ("Snapkeys") is a software development company that specializes in

24        creating smartphone and smartwatch keyboard technology designed to enhance the way

25        people interact with their mobile devices.

26

27   8.   On February 18, 2014 and February 26, 2015, Snapkeys submitted patent applications for

28        its new "iType" keyboard technology, designed to create a user-friendly and efficient

keyboard to be implemented on Smartphone and Smartwatch devices.

9. On or around June 15, 2015, a representative of Google asked a mutual contact of Snapkeys to have Plaintiff Snapkeys reach out to Defendant Google. After an initial call, the representative from Google put Snapkeys in touch with Clem Wright, a representative of Android Wear, a subsidiary branch or division of Google, LLC. ("Google") to discuss the promotion of Snapkeys' brand new "iType" technology on Google's Android Wear smartwatches.

10. In response to these discussions, on July 8, 2015 Google sent the representatives of Snapkeys Ltd. a Developer Non-Disclosure Agreement (the "NDA"), which was properly executed by Snapkeys on or around July 29, 2015, with Google confirming receipt of the NDA on the same date.

11. The purpose of the NDA, as stated within the document, was "to facilitate technical discussions concerning existing or future product development efforts by the parties." The NDA further provided that neither Defendant nor Plaintiff would obtain any intellectual and/or proprietary rights to disclosed information, except as necessary to promote the stated purpose.

12. Over the course of the next year and a half, representatives of Google made ongoing fraudulent and misleading promises and representations about Google's business relationship with Snapkeys. Defendant Google, through its representative Clem Wright, also misled and/or made fraudulent representations and promises to Plaintiff Snapkeys regarding Google's planned use and promotion of Snapkeys' iType keyboard technology. More specifically, Google representative Clem Wright informed representatives of Snapkeys that it would promote Plaintiff's technology for its Android Wear product line in the Google Play Store, going so far as providing Plaintiff with false or misleading

"timelines" for the project's implementation and promising to provide Plaintiff with an Early Access Program (EAP) Agreement.

13. Specifically, the following is a list of some (but not all) of the false, fraudulent, and/or misleading representations and promises which were made by Clem Wright in his capacity as Google's representative, to representatives of Snapkeys in emails, in-person meetings, and/or Google Hangouts from July of 2015 until September of 2016:

- On November 11, 2015 during an in-person meeting between Google and Snapkeys representatives, and beginning on August 13, 2015 on Google Hangouts Chat: Google would promote Snapkeys and its iType technology as a Google partner through various advertising and social media outlets;

- On November 11, 2015 during an in-person meeting between Google and Snapkeys representatives and beginning August 13, 2015 on Google Hangouts Chat: Google would introduce Snapkeys to Original Equipment Manufacturers (OEMs) and ask that they preload the Snapkeys technology on Google devices;

- On November 11, 2015 during an in-person meeting between Google and Snapkeys representatives: Snapkeys' keyboard technology was far more advanced than the keyboard technology Google had been previously developing, and were "amazed" with what the Snapkeys' technology could do;

- On November 11, 2015 during an in-person meeting between Google and Snapkeys representatives: Snapkeys was the furthest along by far amongst all the other keyboard technology companies Google was speaking with, and the Snapkeys' keyboard was ready, and Snapkeys just needed to wait for Google to finish the work on their side of the project;

- On November 11, 2015 during an in-person meeting between Google and Snapkeys representatives; during an email exchange on September 20, 2015; during an email exchange on October 29, 2015; during an email exchange on December 6 – 7, 2015; during an email exchange on January 25 – 26, 2016; during an email exchange on May 2 – 3, 2016; on Google Hangouts Chat beginning on August 13, 2015: Google would send Snapkeys an Early Access Program agreement (EAP) giving Snapkeys the right to receive from Google an early version of Google's software for Android Wear 2.0 devices;

- On November 11, 2015 during an in-person meeting between Google and Snapkeys representatives; during an email exchange on May 2 – 3, 2016; on Google Hangouts Chat beginning on August 13, 2015: Google would send Snapkeys the Application Programming Interface (API) for Google's Android Wear 2.0, as well as an Android Wear 2.0 smartwatch to allow Snapkeys to integrate their technology within the new product;

- On November 11, 2015 during an in-person meeting between Google and Snapkeys representatives; during an email exchange on May 2 – 3, 2016; on Google Hangouts Chat beginning on August 13, 2015: Google would push Snapkeys' iType keyboard in the

Google Play store, and that Snapkeys would be able to monetize the technology by selling licenses to end users for a fee;

- June 2, 2016 email from Google representative Clem Wright to Snapkeys CEO Benjamin Ghassabian: Snapkeys' keyboard would be included and promoted in a collection of "Keyboard for Wear" apps on the Google Play Store, yet to this day Plaintiff is not aware of any such collection actually existing; and

- On November 11, 2015 during an in-person meeting between Google and Snapkeys representatives; and on Google Hangouts Chat beginning on August 13, 2015: Google would release an update for Android Wear 2.0 in the Fall of 2016, and before the release of the Android Wear 2.0 update, Google would provide Snapkeys with the Early Access Program, an Application Programming Interface for Android Wear 2.0, and a smartwatch with the necessary support to implement Snapkeys' iType technology so that iType would be ready for the release date of Android Wear 2.0.

14. Upon mutual agreement between Snapkeys and Google, and after executing the NDA, Snapkeys entrusted Google with an original working prototype of its iType technology for Android, a working prototype which itself along with the software and other underlying technological data constituted confidential information that Snapkeys would not have sent but-for the NDA between the parties.

15. Although Snapkeys' keyboard had been featured in articles discussing the capability of the keyboard and differences between Snapkeys' and other companies' keyboards, the prototype, the software, and all otherwise technological data behind Snapkeys' keyboard had not been made public, including specifically the APK, which allowed Snapkeys' advanced technology to run on Google's Android technology.

16. On September 20, 2015, Clem Wright, a Google representative and Google's product manager, informed Snapkeys representatives that the project involving Snapkeys would likely start in November.

17. On November 11, 2015, representatives of Snapkeys and Google representative Clem Wright met in-person in California to discuss their on-going business relationship. During

this meeting, Google representatives disclosed to Snapkeys for the first time, that they were creating their own smartwatch keyboard, but assured Snapkeys that the Google keyboard was far behind and inferior to the Snapkeys keyboard, and stated that Google would not make its keyboard the default keyboard on the Android Wear smartwatches, but instead would allow the user to decide which keyboard it wanted to download and use on their smartwatch. Google also explained that this option for users would be how Snapkeys monetized its keyboard, as Google would promote Snapkeys' keyboard on the Google Play Store as promised, and users could implement that keyboard on their Smartwatch devices. Snapkeys was told that Google would send Plaintiff a "developer/partner agreement" and an EAP agreement two to three weeks later, and that Plaintiff would be among the first to receive certain software pursuant to these agreements, in order to refine iType. Google relayed to Snapkeys that the Android Wear update that Plaintiff anticipated being a part of would be released in the next Quarter 1. Additionally, Google represented to Snapkeys an intention to promote Snapkeys as Google's partner in the media.

18. Based on the representations from the November 11, 2015 meeting and prior representations, and at Google's request, Snapkeys ported its technology into the existing Android Wear 1.0, and provided Google representatives at the meeting with an additional smartwatch prototype with its iType technology running on Android Wear 1.0, which Google retained in its possession. This prototype constituted confidential information and technology which Snapkeys provided with the understanding that this technology would be protected under the parties' NDA. Later, Snapkeys was asked to port its technology into a round smartwatch, which Snapkeys did based on Google's past representations. Snapkeys believed that the NDA protected its interest in the prototypes, and that Snapkeys retained all ownership rights under the NDA.

19. In or around the end of February of 2016, Snapkeys sent a Google "Hangouts" message to Clem Wright, the representative of Google, asking him for an update on the project's status,

and the promises and representations made to Snapkeys in the months prior. The representative of Google assured Snapkeys that Google would fulfill its promises to Snapkeys during the month of February. Shortly thereafter, Defendant Google acted willfully, and in bad faith, to fraudulently erase these communications, and all communications and transcripts from the Google "Hangouts" meeting between representatives of the Plaintiff and Defendant, a chat in which many of Defendant's fraudulent assurances, representations, and promises to Snapkeys were made.

20. The multitude of messages on "Hangouts" dating back from the beginning of the parties' relationship were present and visible for months. The communications disappeared suddenly, without warning, and all at once. Documentation of Google's policy shows that the history should have remained indefinitely unless one of the parties' deleted the messages. Had Google's "default" setting been to turn history to "off," then Snapkeys representatives would not have been able to see the messages months after they were sent.

21. On November 26, 2015, Snapkeys informed Google that major companies had expressed interest in implementing Snapkeys' keyboard in their products. Google responded by informing Snapkeys that it was permissible to pursue opportunities for "non-wear" companies, which fundamentally represented to Plaintiff that it was not allowed to pursue other opportunities regarding the "for-wear" technology it had been discussing with Google. This is especially true considering that there were virtually no non-wear smartwatch companies that supported keyboard technology in development at the time, or at least of which Plaintiff was aware. Snapkeys eschewed those for-wear opportunities as a result of this statement.

22. Furthermore, while the parties' NDA did state that it was not intended to create a business relationship, Google's instruction that Snapkeys could not seek opportunities with other "for-wear" companies regarding Snapkeys's iType keyboard technology that was the

subject of the parties' NDA is evidence of the mutual understanding that the parties were, in fact, planning to engage in a business relationship. Therefore, Plaintiff relied on Defendant's fraudulent representations. More specifically, Plaintiff's reliance was justified because Google had made a multitude of promises to Plaintiff Snapkeys indicating a future business relationship, and because Google's agent represented to Snapkeys that it could only seek virtually non-existent "non-wear" opportunities, although no statement in the NDA prohibited Snapkeys from disclosing its own confidential information and/or technology to a third-party. Thus, Plaintiff Snapkeys believed that Google's representations of the parties' future relationship was the reason for this instruction and obliged.

23. In December, Google told Snapkeys that it would likely begin the Early Access program in January, despite previously stating that it would begin in November the previous year, and at that time Google would make the EAP available to Snapkeys.

24. As of May 2016, the Early Access Program still had not begun. Additionally, despite all previous promises to provide Snapkeys the necessary means prior to the release of Android Wear 2.0 in May of 2016, in an email on May 1, 2016 Google representative Clem Wright informed Snapkeys representative Ryan Ghassabian that it planned to announce the Android Wear 2.0 project, and to publish a developer preview of Android Wear 2.0, at the 2016 Google I/O. Google further indicated that it would be at this time Snapkeys would be able to download the necessary software to begin testing its input method editor (IME) on an Android Wear smartwatch. When the representatives of Snapkeys asked what they could do in preparation for the Google I/O, they were reassured in a May 3, 2016 email from Google representative Clem Wright that their product did not need any further development. Specifically:

"Right now there won't be much benefit to you to getting an early build before I/O, which is in just two weeks on 5/18. First, you have already done most of the development :) Second, there will be a bit of churn as we continue to fix issues in the build."

25. Google failed to deliver on these promises and representations before the release of Android Wear 2.0, and never informed Snapkeys about releasing its Android Wear 2.0 at the Google I/O. Additionally, these new promises and representations made in May of 2016 turned out to be misleading, as during this time Google was actually in cooperation with one of Plaintiff's competitors, a third-party Chinese tech company, to apparently implement a third-party keyboard, a keyboard which was announced at Google I/O for the new Android Wear 2.0 smartwatch.

26. Google continued to fraudulently mislead Snapkeys regarding the future of its technology within the Android Wear product line, and encouraged Snapkeys to continue investing valuable resources into its iType keyboard technology, including the development of additional keyboard features with the promise and understanding that the Snapkeys' keyboard would launch with Google's Android Wear Smartwatch product line, and be promoted within the Google Play store.

27. In response, Snapkeys kept funneling its limited financial resources into the iType keyboard in lieu of other projects, based on Google's false representations, assurances, and promises. Snapkeys provided Google with a third confidential prototype version of the product to be implemented in the Alpha Channel on the Google Play Store.

28. However, suddenly on August 11, 2016, Google claimed Snapkeys that it found issues with the product—notwithstanding Google's previous declarations that Snapkeys' technology was "impressive," that Snapkeys had "already done most of the development," and that Snapkeys' technology was "far ahead" of its competitor's products, including Google itself. Google stated that Snapkeys' iType technology would not be promoted in the Google Play store or included in Google's collection of "Keyboards for Wear," even though Google raised these alleged "issues" for the first time, with no chance for Snapkeys to

address and/or fix anything, despite Snapkeys' request for a few days to address Google's "issues," and contrary to Google's promise that Snapkeys had "plenty of time to optimize." The claimed "issues" and doubts about the veracity of same are as follows:

a.     *Delay in load up time of the keyboard;*

- This issue was never raised in the past and is part of the keyboard implementation process. This process could not have been addressed for Android Wear 2.0 without the Early Access Program, a program that Google promised to provide to Snapkeys specifically to address something like this, but never did. Raising this "issue" as a reason to reject Snapkeys' keyboard becomes more astonishing when considering that Google had also promised to provide necessary support for such kind of "issues."

b.     *Expected gesture space and backspace features; and*

- This alleged "issue" and "expectation" was never raised by Google in the past, but nevertheless Snapkeys informed Google (to no avail) that could be quickly addressed.

c.     *Buttons and icons on the keyboard were "quite small;"*

- Again, Google did not previously raise this. It is questionable that Google possessed the Snapkeys' keyboard and prototypes for over a year and suddenly decided this was a problem. Further, it is completely contradictory based on Google's current smartwatch keyboard, which contains buttons and icons smaller than that of Snapkeys' keyboard.

29. As a result of Google's announcement, Snapkeys lost nearly all of its product investors, and Snapkeys' primary staff left the company.

30. To this day, Plaintiff is not aware of any collection of "Keyboards for Wear" ever being implemented on the Google Play Store, a collection that Google continually represented to

Snapkeys following the 2016 Google I/O would not only exist, but would include and promote Snapkeys' iType Keyboard.

31. On August 15, 2016, and in spite of all assurances by Snapkeys that these alleged "issues" could resolve quickly, or had already been resolved, Google's representative Clem Wright rejected Snapkeys' keyboard. Moreover, contrary to his previous representations, Wright stated that he did not have the authority to add Snapkeys' keyboard to this "Keyboards for Wear" collection, or to the Google Play Store.

32. On November 1, 2016, legal counsel for Snapkeys sent a cease and desist letter to Google stating that Snapkeys was terminating the Non-Disclosure Agreement that was entered into on July 29, 2015, effective immediately, and demanding that Google cease and desist from using any and all Snapkeys' technology, confidential information and intellectual property. Google was also requested to immediately send back the two Android watch prototypes that Snapkeys entrusted to Google. Finally, Snapkeys requested a hard copy of the entire conversation history between Google's representative Mr. Clem Wright and Snapkeys' representative Benjamin Ghassabian from the "Google Hangouts" video conference and chats, which had been removed without Mr. Ghassabian's consent or approval.

33. On November 3, 2016, Google acknowledged receipt of Snapkeys' cease and desist letter and stated that it would respond as soon as possible. Google never responded to Snapkeys, never returned the Android prototypes, and never provided a copy of the Google Hangouts conversation history.

34. On February 20, 2019, legal counsel for Snapkeys sent another letter to Google, putting Google on notice that it had not received a response to its November 1, 2016 cease and desist letter as was promised, Snapkeys' Android prototypes had not been returned, no hard

copy of the Google Hangout transcript was provided, and no proof of destruction of the technology entrusted to Google by Snapkeys had been provided.

35. On March 14, 2019, counsel for Google responded to Snapkeys' February 20, 2019 letter, wholly denying any fault on the part of Google, refusing to produce the Google Hangouts transcript, and stating that Google unlawfully destroyed the Snapkeys' Android prototypes without their consent.

## COUNT I – BREACH OF NON-DISCLOSURE AGREEMENT

36. Plaintiff repeats and realleges paragraphs 1 through 35 as if fully set forth herein.

37. On July 29, 2015, the parties finalized a non-disclosure agreement preventing the parties' from "any unauthorized use or disclosure of confidential information."

38. On information and belief, Defendant Google obtained confidential information and technology software from Plaintiff Snapkeys in relation to an on-going relationship, which evolved into and/or was portrayed to Snapkeys as becoming a business relationship between the two entities. During that relationship, Google promised to develop and promote Plaintiff's smartwatch keyboard technology within the Google Play Store and the Android Wear product line.

39. This confidential information included two Snapkeys' prototypes with its iType keyboard technology fully integrated, which was acknowledged by Defendant Google as superior, and far ahead of any other third-party competitor in the industry, including Google's own smartwatch keyboard. Not only were the two prototypes confidential, but the underlying technology that made Snapkeys' keyboards so far advanced was confidential. Furthermore, Snapkeys provided Google with information regarding the specific considerations and interface implementations used in its iType technology, and how those implementations helped Snapkeys develop a product that Google admitted being far ahead of the

competition. Snapkeys told Google how Plaintiff designed its smartwatch keyboard technology to enable an optimized experience for smartwatch typing.

40. When Google released its own keyboard, the similarities between Google's keyboard and Snapkeys' keyboard show that Google used confidential information contained on and/or learned from the Snapkeys' prototypes in its own Smartwatch keyboard technology. Google published its keyboard on Google's Android Wear website without authorization from Snapkeys or providing Snapkeys any credit or monetary benefit. Although Google had previously told Snapkeys that Snapkeys was far ahead of even Google's technology, Google suddenly had technology comparable to Snapkeys' keyboard.

41. Google's use of Snapkeys' technological data breaches Paragraph 8 of the Non-Disclosure Agreement because the coding, software, and/or other technological data, including the APK, underlying the keyboard were certainly not "residuals" and could not have been remembered unintentionally and/or without any aids by Google's representatives.

42. The destruction and/or use and/or discarding of Snapkeys' prototypes materially breached Paragraph 8 of the Non-Disclosure Agreement because Google had no rights to the prototypes and the prototype itself is not a "residual."

43. On information and belief, Defendant Google also provided this information to third-party competitors of Plaintiff Snapkeys and/or permitted the implementation and/or inspection of this technology by third-party competitors. On information and belief, in the course of providing this information to third-party competitors, Defendant Google materially breached Paragraph 3 of the Non-Disclosure Agreement by divulging confidential information, in the form of the Snapkeys' smartwatch prototypes and/or information gleaned from same to third-party competitors of Plaintiff Snapkeys, and by permitting the

use and/or inspection of this confidential information for use in the implementation of competitor keyboard technologies on Defendant Google's Android Wear 2.0 product line.

44. Plaintiff Snapkeys has been and continues to be damaged as a result of Defendant Google's material breach of Paragraphs 3 and 8 of the Non-Disclosure Agreement.

## COUNT II – CONVERSION

45. Plaintiff repeats and realleges paragraphs 1 through 44 as if fully set forth herein.

46. On October 6, 2015, upon the execution of the NDA, upon mutual agreement by the parties, and based on the language of the NDA that confidential technology provided pursuant to the NDA would not confer property rights in the technology to the receiving party, Snapkeys entrusted its first confidential smartwatch prototype with its iType technology to Mr. Wright at Google's headquarters in California.

47. The next day, on October 7, 2015, Mr. Wright contacted the representatives of Snapkeys stating that the Snapkeys keyboard was "very impressive," and asked that Snapkeys entrust additional software implementing the technology on the Android Wear product line to Google.

48. On November 11, 2015, representatives of Snapkeys met with Google representative, Clem Wright. At Google's request, and at significant expense to Plaintiff, Snapkeys ported its technology into the existing Android Wear 1.0, and entrusted Mr. Wright with a second confidential smartwatch prototype with its iType technology running on Android Wear 1.0, which Google retained in its possession with the permission of Snapkeys. Snapkeys did not agree, intend, and/or propose to confer rights to the prototype unto Google. Indeed, Snapkeys believed that the NDA protected its interest in and ownership of prototypes, even when entrusted to Google.

49. After becoming aware that Defendant's representations and promises were false, fraudulent and misleading, Plaintiff sent Defendant a cease and desist letter on November 1, 2016, demanding Google return to Plaintiff, all prototypes and property of Plaintiff provided to Google and retained in Google's possession.

50. Following receipt of Plaintiff's demand letter, Defendant failed to return Plaintiff's confidential prototype technology. Instead, Defendant stated that it would respond to Plaintiff's November 1, 2016 letter. Yet no response was ever provided, and Plaintiff's prototypes were never returned.

51. On March 14, 2019, Defendant Google admitted that Plaintiff's prototypes and technology were intentionally and willfully destroyed by Defendant Google against the wishes of and without consultation with Plaintiff Snapkeys, resulting in the loss of those prototypes and the financial investment that was required to produce and refine them.

52. Defendant's unauthorized destruction of Plaintiff's property resulted in substantial financial loss to Plaintiff.

## COUNT III – UCL: UNFAIR COMPETITION and FRAUDULENT CONDUCT

### (Cal. Business & Prof. Code § 17200)

53. Plaintiff repeats and realleges paragraphs 1 through 52 as if fully set forth herein.

### *UNFAIR COMPETITION*

54. On information and belief, Google engaged in the practice of making false, misleading, and fraudulent representations and promises to Plaintiff Snapkeys, that Defendant Google would engage in an agreement and business relationship with Plaintiff to promote Plaintiff's keyboard technology in its Google Play Store, and the Android Wear Smartwatch product line. However, Google's true intent was to undertake dilatory tactics

that delayed and prevented Plaintiff Snapkeys from entering into agreements with other smartwatch companies and/or manufacturers, such as Fossil, under the guise of promises of a better and more beneficial business relationship with Google.

55. Specifically, when Snapkeys told Google, in December of 2015, that a number of other Smartwatch companies showed interest in the Snapkeys keyboard, Google then informed Snapkeys that it was free to engage other 'non-wear' companies, essentially disallowing Snapkeys to pursue in any business opportunity with any 'for-wear' Smartwatch company. By Google prohibiting Snapkeys to engage with 'for-wear' companies, Snapkeys had no opportunity to be successful in the 'non-wear' smartwatch keyboard market, as there were virtually no devices for Snapkeys to integrate its smartwatch keyboard technology into. Google had full control of the smartwatch keyboard market, and had the ability to dictate the success of any keyboard, as Google controlled all the 'for-wear' devices, and gave OEMs the Android Wear software with Google's smartwatch keyboard set as the default, for free. Thus, Snapkeys continued to rely on Google's false, misleading, and fraudulent representations and promises to its detriment.

56. Defendant Google's actions were intended and designed to induce Snapkeys into delaying and/or stop seeking partnerships with Google's competitors are indicative of Google's large-scale practice of preying on smaller start-up companies at the expense of start-ups and larger competitors. This harms competition on a number of levels in that these practices 1) allow Google to produce products without having to provide proper compensation and/or monetization to the start-up companies – such as happened here with Snapkeys, and alleged in the above-recited facts; 2) allow Google to stifle competition from serious, large competitors that are vying for excellent technology from start-ups to integrate into their own products – as occurred in this case where Snapkeys turned down and/or delayed business opportunities with companies such as Fossil in favor of Google's promises; and 3) harms competition from start-up companies who are seeking to market advanced and

new technology for compensation to the business that will provide them with the best option – which is precisely what happened to Snapkeys here. Each of these three consequences are interrelated and harm competition.

57. Upon information and belief, in order to hide its real intention (i.e. delaying Snapkeys to gain time) and instead of sending the promised materials to Snapkeys, Google sent the same materials to a number of other keyboard manufacturers that either had an unusable keyboard technology for the smartwatch or did not have any keyboard technology for the smartwatch at all. By doing so, Google misleadingly suggested that it was open to those third-party keyboards. In fact, Google knew that none of those keyboards could be a competitor for that of Google's. It is not surprising that none of those keyboards were adopted or supported by Google later. On the other hand, Google knew that Snapkeys' keyboard was "far ahead of Google's keyboard", but it kept that impressive technology from the market.

58. Defendant Google's dilatory tactics ensured that it had enough time to advance its own technology to approach the level of Plaintiff Snapkeys' technology. This tactic further succeeded in effectively pushing Snapkeys out as a serious competitor for Google's own keyboard. This practice harms start-up companies who have a product that is a contender to best Google's and it did so in this case, not only to the harm of Snapkeys, but to the detriment of the smartwatch keyboard market.

### *FRAUDULENT CONDUCT*

59. Google committed fraudulent conduct in creating a misleading alert once a user enabled the Snapkeys iType keyboard on an Android Wear smartwatch. This alert told Smartwatch users attempting to enable the Snapkeys keyboard, that Snapkeys, Ltd. could use the keyboard to collect all text that the user types including the user's personal information, such as passwords and credit card information, in an attempt to discourage users from

enabling and using the Snapkeys keyboard after downloading it from the Google Play store. However, this alert was fraudulent because it was untrue. In fact, bot Snapkeys' terms and conditions and privacy policy specifically indicated it did not collect this information. Most importantly, Snapkeys does not collect the text that a user types because its keyboard is not designed to do so.



60. This alert, however, did not appear when a Smartwatch user attempted to use Google's default keyboard, a keyboard that *was* capable of collecting the same consumer information, evidencing Google's bad faith and fraudulent practices to manipulate the end-users into using Google's keyboard, and drive users away from the Snapkeys keyboard. Additionally, this alert also did not appear when a smartwatch user attempted to enable Google's handwriting input system from the Input Method settings on the smartwatch device.

61. Google had an obligation to alert the public to the fact that its own keyboard and handwriting input systems were collecting consumer data to the same degree that it was alerting consumers that Snapkeys' app was doing the same. It further had an obligation not to mislead consumers into believing that Snapkeys' technology would collect the information despite Snapkeys' policies to the contrary. However, Google intentionally and fraudulently hid its alert in generic terms and conditions that were accepted upon receipt of an Android Wear Device, that gave consumers no explicit warning of Google's collection of use data.

62. Google preloaded its own keyboard on all Android Wear Devices, without giving users the choice to accept the keyboard and without alerting users to the data collection. Meanwhile, Google intentionally displayed a frightening and untrue alert for end-users trying to use Snapkeys' keyboard after downloading it from the Google Play store. This misconduct by Google were intended to discourage and/or cause the end-user not to use the Snapkeys' keyboard, and likely achieved this aim. Consumers were more likely to use Google's keyboard without knowing that Google's app was collecting the same data due to the lack of alert that was displayed.

63. More specifically, logic dictates that if the Google Play Store alerts customers to potential data collection through big, unavoidable alerts, consumers are likely to expect that any app, including Google's apps, that collects data will have the same alert appear. When attempting to use and/or download Google's keyboard app, then, the failure of an alert to appear will logically lead a consumer to rationally conclude that Google's app does not collect the same user information as Snapkeys' or other small companies' keyboard apps, which Google in fact does and Snapkeys does not. Thus, the alert, or lack thereof in Google's case, is misleading and fraudulent.

64. Defendant's actions in both of these regards constituted unfair and fraudulent competition in violation of Section 17200 of the California Business and Professional Code.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Plaintiff Snapkeys respectfully requests this Court to enter judgement against Defendant Google granting the following relief:

A.     The entry of judgment in favor of Snapkeys against Defendant;

B.     A finding that Defendant violated the terms of the parties' Non-Disclosure Agreement;

C. A finding that Defendant induced Plaintiff into giving Defendant confidential information in the form of Plaintiff's smartwatch prototypes, under fraudulent and false pretenses;

D. Damages adequate to compensate Plaintiff Snapkeys for Defendant's breach of the Non-Disclosure Agreement, and for the fraudulent promises and inducements made by Defendant Google to obtain Plaintiff's confidential information;

E. Restitution and reliance damages for Plaintiff's financial loss and significant financial expenditures which Plaintiff accrued as a result of its compliance with Google's requests and Google's misappropriation of its technology, and which occurred as a result of Plaintiff's reliance on the false and fraudulent representations and promises of the Defendant; and

F. Such other and further relief that Plaintiff is entitled to under the law, and any other and further relief that this Court or a jury may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff Snapkeys hereby demands a jury trial on all issues so triable in this action.

DATED: April 3, 2020

Respectfully submitted,

s/ D. Bradley Kizzia
**D. BRADLEY KIZZIA**
**Lead Attorney**
State Bar No. 11547550
bkizzia@kjpllc.com
**KIZZIA JOHNSON PLLC**
1910 Pacific Ave., Ste. 13000
Dallas, Texas 75201
(214) 451-0164
Fax: (214) 613-3330

**DAWN M. SMITH**
Sᴍɪᴛʜ Cʟɪɴᴇsᴍɪᴛʜ, LP
325 N. St. Paul
Republic Towner, 29th Floor
Dallas, TX 75201
dawn@smithclinesmith.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above and foregoing instrument has been forwarded to all counsel of record on the 3rd day of April, 2020 in accordance with the Federal Rules of Civil Procedure.

David H. Kramer
Sara Tolbert
Wilson, Sonsini, Goodrich, & Rosati
650 Page Mill Road
Palo Alto, CA 94304
(650) 493-9300 (telephone)
(650) 565-5100 (facsimile)
dkramer@wsgr.com
stolbert@wsgr.com

Charles T. Graves
Wilson, Sonsini, Goodrich, & Rosati
1 Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2000 (telephone)
(415) 947-2099 (facsimile)
tgraves@wsgr.com

*/s/ D. Bradley Kizzia*
**D. BRADLEY KIZZIA**