United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SNAPKEYS, LTD,<br><br>                Plaintiff,<br><br>        v.<br><br>GOOGLE LLC,<br><br>                Defendant. | Case No. 19-CV-02658-LHK<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 98 |

Plaintiff Snapkeys, Ltd. ("Snapkeys") sues Defendant Google LLC ("Google") for breach of contract and conversion. Before the Court is Google's motion for summary judgment as to Snapkeys' claims for breach of contract and conversion, ECF No. 98. Having considered the submissions of the parties, the relevant law, and the record in this case, the Court GRANTS Google's motion for summary judgment.

## I.        BACKGROUND

### A.  The Parties

Snapkeys is a "software development company that specializes in creating smartphone and smartwatch keyboard technology." TAC ¶ 7. Snapkeys is a foreign limited liability company based in Israel. *Id.* ¶ 1. Google is a corporation organized under the laws of Delaware with its

1  principal place of business in Mountain View, California. *Id.* ¶ 2.

2  **B. Google's Smartwatch Keyboard Application**

3      The instant case stems from discussions between the parties regarding the promotion of

4  Snapkeys' keyboard application, which runs on Google's Android Wear smartwatches. *Id.* ¶ 9.

5  Prior to the parties' engagement with each other, several Google engineers began to develop

6  Google's own keyboard application for Android Wear smartwatches, whose code was based on

7  code from Google's pre-existing keyboard application for Android phones. Wright Decl. ¶ 21;

8  Blume Decl. ¶ 3; Renouf Decl. ¶¶ 5–6; Ouyang Decl. ¶ 7; Ou Decl. ¶¶ 5, 8.

9      In September 2014, Arthur Blume, who was an engineering manager at Google, came up

10  with the idea of scaling Google's already existing keyboard to a smartwatch. Blume Decl. ¶ 3.

11  Blume created a prototype of this keyboard by October 2014. *Id.* ¶ 3, Exh. 1. Shortly after

12  developing the prototype keyboard, Blume asked Mark Renouf, a software engineer at Google, to

13  work on the keyboard. *Id.* ¶ 4; Renouf Decl. ¶ 2. By late 2014, Blume and Renouf began to work

14  on the keyboard with Clement Wright, who was a Product Manager on the Android Wear team,

15  and Mikkel Koser, who was a user interface designer. Renouf Decl. ¶ 3.

16      Separately, in early 2015, Tom Ouyang, an engineer at Google who had written the code

17  for Google's pre-existing keyboard, became interested in understanding how the code for

18  Google's pre-existing keyboard could be used to create a keyboard for smartwatches. Ouyang

19  Decl. ¶ 6. In February 2015, Ouyang circulated his first prototype of a smartwatch keyboard based

20  on the code for Google's pre-existing keyboard. *Id.* ¶ 7. In April 2015, a video showing the

21  prototype was created. *Id.* ¶ 8.

22      In May 2015, the two teams merged. Ou Decl. ¶ 3. That summer, Renouf and Henry Ou,

23  another software engineer at Google, further modified the code for Google's pre-existing keyboard

24  to adapt it to a smartwatch. *Id.* ¶ 5; Renouf Decl. ¶ 5. On August 28, 2015, the Google team

25  released a prototype of its smartwatch keyboard application for internal testing. *Id.* ¶ 9; Ouyang

26  Decl. ¶ 10; Renouf Decl. ¶ 7. The final version of Google's smartwatch keyboard application,

27  which was released in March 2016, was consistent with the version released in August 2015.

28

Case No. 19-CV-02658-LHK
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    Wright Decl. ¶ 21; Renouf Decl. ¶ 8.

2    **C.  The Non-Disclosure Agreement**

3        Beginning in July 2015, the parties engaged in preliminary discussions to promote

4    Snapkeys' keyboard application on Android Wear. TAC ¶ 9. Snapkeys' main contact at Google

5    was Clement Wright ("Wright"), a Product Manager for the Android Wear team. Wright Decl. ¶ 5.

6    Wright is "not a software engineer and do[es] not have the skills or training to read or write

7    software code at a professional level." *Id*. As a Product Manager, part of Wright's role was "to

8    facilitate third party app developers in their own efforts to solve the challenges of fitting

9    keyboards . . . on a small watch face." *Id*. ¶ 9. It was within this context that Wright engaged with

10   Snapkeys, which had created a keyboard application.

11       At the outset of the parties' relationship, Wright sent Snapkeys a Developer Non-

12   Disclosure Agreement (the "NDA"), which was executed by the parties on July 29, 2015. *Id*. ¶ 10.

13   The NDA's purpose was "to facilitate technical discussions concerning existing or future product

14   development efforts by the parties (the 'Purpose')." The NDA provided that "[a] party (the

15   'Discloser') may disclose to the other party (the 'Recipient') information pertaining to the Purpose

16   that the Discloser considers confidential ('Confidential Information')." *Id*. The NDA further

17   provided that the "Recipient may use Confidential Information only for the Purpose." *Id*.

18       The NDA required the recipient of confidential information to "use a reasonable degree of

19   care to protect Confidential Information and to prevent any unauthorized use or disclosure of

20   Confidential Information." *Id*. The NDA established that "[u]nless the parties otherwise agree in

21   writing, Recipient's duty to protect Confidential Information expires five years from disclosure."

22   *Id*. The NDA did not require confidential information to be returned. *Id*. The NDA also stated that

23   "[n]o party acquires any intellectual property rights under this agreement except the limited rights

24   necessary to use the Confidential Information for the Purpose." *Id*.

25       The NDA "impose[d] no obligation to proceed with any business transaction." *Id*. The

26   NDA further stated that "each party recognizes that the other party may in the future develop or

27   purchase products or services related to or similar to the subject matter of Confidential

28   Case No. 19-CV-02658-LHK
     ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

*United States District Court*
*Northern District of California*

1  Information disclosed under this agreement." *Id.*

2  **D. Snapkeys' Delivery of Smartwatches to Google**

3      Snapkeys alleges that, over the course of the following year and a half, Google made a

4  number of fraudulent and misleading promises that it would use and promote Snapkeys' iType

5  keyboard technology. TAC ¶¶ 12–13. Snapkeys consequently provided Google with two

6  smartwatches, which cost Snapkeys a total of $400, with Snapkeys' keyboard application

7  installed. *Id.* ¶¶ 14, 18; Graves Decl. Exh. A at 39:18–19, 40:25–41:3 (deposition of Ryan

8  Ghassabian) (stating that Snapkeys spent about $300 on one smartwatch and $100 on the other).

9      Specifically, on September 20, 2015, Benjamin Ghassabian, the Chief Executive Officer of

10  Snapkeys, emailed Wright and offered to send Wright a smartwatch with the Snapkeys keyboard

11  application installed. Wright Decl. ¶ 28. Subsequently, in October 2015, the first smartwatch was

12  delivered to Wright by mail. *Id.*

13      Around the same time that Wright received the first smartwatch, Benjamin Ghassabian

14  emailed Wright and offered to send a second smartwatch with Snapkeys' keyboard application

15  installed. *Id.* ¶ 30. Benjamin Ghassabian asked whether the smartwatch could be provided to

16  Wright in person at Google's headquarters in Mountain View, California. *Id.* ¶ 31. Subsequently,

17  the second smartwatch was given to Wright during a November 2015 meeting with Ryan

18  Ghassabian and Eby Anavian, two Snapkeys employees. *See id.* ¶ 32; Graves Decl. Exh. A at

19  37:9–17; Exh. I at 105:22–106:6.

20      When Wright was given the watches by Snapkeys, Snapkeys never stated that Wright

21  should return the watches to Snapkeys. Wright Decl. ¶ 31. Both Ryan Ghassabian and Anavian

22  testified in their depositions that, during the meeting with Wright, neither Ryan Ghassabian nor

23  Anavian told Wright that Google needed to return the smartwatches to Snapkeys. *See* Graves Decl.

24  Exh. A at 37:9–17 (deposition of R. Ghassabian) ("Q. When you helped deliver the two prototypes

25  to Google, you didn't ask Mr. Wright to return them to SnapKeys when he was finished with

26  them, did you? A. I didn't tell them he could keep them. Q. Okay. You didn't say either way, did

27  you? A. That discussion never came up."); Exh. I at 105:22–106:6 (deposition of Anavian) ("Q.

28

Now, during the meeting in November that you attended with Mr. Wright and Mr. Ghassabian, you left the prototype with Mr. Wright at that meeting, correct? A. Correct. Q. Okay. And you didn't tell him, 'You need to give this back to us,' correct? A. No, I didn't. Q. And neither did Mr. Ghassabian? A. I don't remember, but I'm sure he didn't.").

### E. Google's Discarding of the Smartwatches

Following the delivery of the first smartwatch, Wright typed on the keyboard for a few minutes as a consumer would. Wright Decl. ¶¶ 28–29. Wright found the user interface in Snapkeys' keyboard application to be "impressive but complicated." *Id*. Wright also found the user interface to be "confusing." *Id*. For example, Wright was not sure how to access punctuation on the keyboard. Wright Decl. ¶ 29, Exh. 1 at 139:15–140:19 (deposition of Wright) ("[I was] asking how to access punctuation, and that was because I found the interface a little bit confusing.").

Similarly, following the delivery of the second smartwatch, Wright typed on the keyboard for a few minutes as a consumer would. Wright Decl. ¶ 35. Wright had a similar experience to when Wright used the first smartwatch. *Id*. ¶ 33 ("I still found the user interface to be confusing and complex.").

Wright did not share the smartwatches with any other Google employee. *Id*. ¶ 37 ("I was the only person who ever used or saw the watches."). Wright stored the smartwatches under his desk in a secure bin that was available only to Wright.  *Id*. ¶ 37, Exh. 1 at 41:1–6 (deposition of Wright) (stating that Wright stored the watches "under my desk in a secure bin that was available only to me, along with a number of other samples from other manufacturers"). Wright "treated . . . the keyboards that were installed on [the watches] as if they were confidential." *Id*. ¶ 37, Exh. 1 at 43:9–14 (deposition of Wright).

In July 2016, Snapkeys sent a new version of its keyboard application that was not contained within a watch. *Id*. ¶¶ 28–29. At the time that Snapkeys sent the new version to Wright, Snapkeys did not ask Wright to return the two smartwatches. *See* Graves Decl. Exh. A at 60:12–17 (deposition of Ryan Ghassabian) ("Q. . . When SnapKeys sent Mr. Wright an APK for the newer

Case No. 19-CV-02658-LHK
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    version of its prototype roughly around July of 2016, you didn't ask Mr. Wright to send you back
2    the two older prototypes at that point in time, did you? A. We did not.").

3           Because Snapkeys sent Wright a new version of its keyboard application, Wright discarded
4    the two watches with the older version of Snapkeys' keyboard application, as well as products
5    from other parties, as part of a routine cleanup of his desk in July or August of 2016. *Id*. ¶ 43, Exh.
6    1 at 40:10–18 (deposition of Wright) ("I was able to test and install a more recent version of
7    [Snapkeys'] keyboard, which made the earlier versions that were on those other watches obsolete,
8    and in the normal process of clearing out my desk, knowing that they were no longer relevant, I
9    discarded them along with a number of other watches."). Wright disposed of the watches in a
10   secure electronic waste bin, which was part of his department's practice for handling product
11   samples that were no longer relevant. *Id*. ¶ 44. The smartwatches were subject to secure shredding
12   under Google's waste disposal contract. *Id*.; Sheff Decl. ¶ 3, Exh. 1.

13          After Snapkeys sent Wright the third version of its keyboard application, Wright ultimately
14   decided not to promote Snapkeys' keyboard application. TAC ¶ 24; Wright Decl. ¶ 41. In an email
15   to Benjamin Ghassabian, Wright stated that Wright found issues with Snapkeys' keyboard
16   application. Wright Decl. ¶ 41; Kizzia Decl. Exh. G.

17          On November 1, 2016, a lawyer for Snapkeys sent Google a letter demanding for the first
18   time that the smartwatches were returned. Wright Decl. ¶ 46, Exh. 24; Kizzia Decl. Exh. D.
19   However, by that time, Wright had already discarded the smartwatches.

20   **F.  Procedural History**

21          On May 16, 2019, Snapkeys filed the instant case against Google. ECF No. 1. Snapkeys'
22   complaint included a claim for misappropriation of trade secrets. *Id*. Google then sent Snapkeys a
23   letter that explained that Snapkeys had already publicized the alleged "secrets" before Snapkeys
24   contacted Google. *See* Graves Decl. Exh. L

25          On July 9, 2019, Snapkeys filed a First Amended Complaint that omitted the trade secrets
26   claim. ECF No. 13. Google moved to dismiss the amended complaint on July 23, 2019.  ECF No.
27   14.

28
Case No. 19-CV-02658-LHK
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

*United States District Court*
*Northern District of California*

1    In lieu of opposing the motion to dismiss, Snapkeys filed a Second Amended Complaint on

2    September 16, 2019. ECF No. 34. On September 25, 2019, Google moved to dismiss the Second

3    Amended Complaint. ECF No. 35.

4    On March 4, 2020, the Court granted in part and denied in part Google's motion to

5    dismiss. ECF No. 54. The Court denied Google's motion to dismiss Snapkeys' claims for breach

6    of the NDA and conversion. *Id.* at 5–7, 10–12. The Court dismissed Snapkeys' claim for fraud

7    with prejudice because the Court held that Snapkeys' fraud claim was superseded by the

8    California Uniform Trade Secrets Act. *Id.* at 7–10. The Court dismissed Snapkeys' claim for

9    breach of the implied covenant of good faith and fair dealing with prejudice because the Court

10   concluded that this claim was impermissibly duplicative of the breach of contract claim. *Id.* at 16–

11   17.  The Court dismissed Snapkeys' UCL claim with leave to amend. *Id.* at 12–15.

12   On April 3, 2020, Snapkeys filed its Third Amended Complaint, which included an

13   amended UCL claim. *See* TAC ¶¶ 36–64. On May 8, 2020, Google moved to dismiss the amended

14   UCL claim. ECF No. 59.

15   On October 30, 2020, this Court granted Google's motion to dismiss Snapkeys' UCL claim

16   with prejudice. ECF No. 74. As to Snapkeys' UCL unfair prong claim, the Court concluded that

17   Snapkeys had not plausibly alleged that Google's conduct harmed competition. *Id.* at 5–9. As to

18   Snapkeys' UCL fraudulent prong claim, the Court concluded that Snapkeys did not have standing

19   to challenge Google's alleged fraudulent statements because Snapkeys did not allege that

20   Snapkeys relied on the statements. *Id.* at 10–11. The Court dismissed Snapkeys' UCL claim with

21   prejudice because the Court concluded that amendment would be futile, would unfairly prejudice

22   Google, and would cause undue delay. *Id.* at 9, 11–12.

23   On December 18, 2020, Snapkeys filed a motion for leave to file a Fourth Amended

24   Complaint. ECF No. 80. On May 8, 2021, the Court denied Snapkeys' motion for leave to file a

25   Fourth Amended Complaint because the Court found undue delay, undue prejudice, and three

26   previous amendments by Snapkeys, and Snapkeys had not shown good cause to modify the case

27   schedule. ECF No. 116.

28

Case No. 19-CV-02658-LHK
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

On March 19, 2021, Snapkeys filed a motion for a finding of spoliation. ECF No. 99. Specifically, Snapkeys sought a finding that Google had spoliated evidence by discarding Snapkeys' two smartwatches. *Id*. On March 22, 2021, the Court referred the motion for spoliation to United States Magistrate Judge Virginia DeMarchi. ECF No. 100. On May 11, 2021, Judge DeMarchi held a hearing on the motion for spoliation. ECF No. 117. On May 17, 2021, Judge DeMarchi denied Snapkeys' motion for a finding of spoliation. ECF No. 119. Judge DeMarchi concluded that Snapkeys failed to establish that Google had an obligation to preserve evidence when Google discarded Snapkeys' two smartwatches in July or August of 2016, months before Google first received notice of Snapkeys' potential legal claim on November 1, 2016. *Id*. at 2.

On March 18, 2021, Google filed the instant motion for summary judgment. ECF No. 98 ("Mot."). On April 8, 2021, Snapkeys filed an opposition. ECF No. 105 ("Opp'n"). On April 15, 2021, Google filed a reply. ECF No. 110 ("Reply").

## II.   LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

The Court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,]...since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file,

1   designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal

2   quotations omitted). If the nonmoving party fails to make this showing, "the moving party is

3   entitled to judgment as a matter of law." *Id.* at 323.

4       For purposes of summary judgment, the Court must view the evidence in the light most

5   favorable to the nonmoving party; if the evidence produced by the moving party conflicts with

6   evidence produced by the nonmoving party, the Court must assume the truth of the evidence

7   submitted by the nonmoving party. *Leslie v. Grupo ICA,* 198 F.3d 1152, 1158 (9th Cir. 1999). The

8   Court's function on a summary judgment motion is not to make credibility determinations or

9   weigh conflicting evidence with respect to a disputed material fact. *T.W. Elec. Serv. v. Pac. Elec.*

10  *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

## III.  DISCUSSION

12      Google moves for summary judgment as to both of Snapkeys' remaining claims: (1)

13  breach of contract and (2) conversion. The Court addresses each claim in turn.

### A.  Breach of Contract

15      Google contends that Google is entitled to summary judgment on Snapkeys' claim for

16  breach of contract. Mot. at 14–18. Breach of contract requires: "(1) the existence of a contract, (2)

17  performance or excuse for nonperformance, (3) defendant's breach, and (4) damages." *AlterG,*

18  *Inc. v. Boost Treadmills, LLC*, 388 F. Supp. 3d 1133, 1147 (N.D. Cal. 2019) (citing *Oasis West*

19  *Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011)). In the instant motion, Google contends that

20  Snapkeys has not created a genuine issue of material fact as to the third element, Google's breach.

21  Mot. at 14–18.

22      In Snapkeys' Third Amended Complaint, Snapkeys alleges that Google breached the

23  parties' July 29, 2015 Non-Disclosure Agreement (the "NDA") based on Google's treatment of

24  two smartwatches equipped with Snapkeys' keyboard application that Snapkeys provided to

25  Google. TAC ¶¶ 39–43. Snapkeys' Third Amended Complaint alleges two theories as to why

26  Google's treatment of the two smartwatches breached the NDA. First, Snapkeys' Third Amended

27  Complaint alleges that Google breached the NDA by misusing the "coding, software, and/or other

28

9

United States District Court
Northern District of California

United States District Court
Northern District of California

1   technological data" underlying Snapkeys' keyboard application, which was installed on the two

2   smartwatches. *Id.* ¶¶ 39–41, 43. Second, Snapkeys' Third Amended Complaint alleges that Google

3   breached the NDA by discarding the two smartwatches. *Id.* ¶¶ 39, 42. The Court addresses each of

4   Snapkeys' alleged theories in turn.

5       **1.  Alleged Use of Snapkeys' Code, Software, or Other Technological Data**

6       In Snapkeys' Third Amended Complaint, Snapkeys alleges that Google breached the NDA

7   by misusing the "coding, software, and/or other technological data" underlying Snapkeys'

8   keyboard application, which was installed on the two smartwatches. *Id.* ¶ 41; *see also id.* ¶ 39

9   (alleging that "the underlying technology that made Snapkeys' keyboard so far advanced was

10  confidential"); Graves Decl. Exh. K at 3–5 (identifying the confidential information as "data

11  which made the following features [on Snapkeys' keyboard application] work properly")[1].

12  Specifically, Snapkeys' Third Amended Complaint alleges that Google used Snapkeys' code in

13  Google's own keyboard application or Google shared Snapkeys' code with third parties. TAC ¶¶

14  40, 43.

15      Google contends that Snapkeys has not created a genuine issue of material fact on the

16  theory that Google misused the code underlying Snapkeys' keyboard application. Mot. at 14–17.

17  The Court agrees with Google for five reasons. First, although Snapkeys alleged this theory in

18  Snapkeys' Third Amended Complaint, Snapkeys abandoned this theory by failing to raise it in

19  Snapkeys' opposition to the instant motion for summary judgment. Second, Snapkeys' testimony

20  establishes that the code underlying Snapkeys' keyboard application was encrypted, which

21  prevented Google from accessing it. Third, Google's uncontroverted evidence establishes that

22  Google independently created Google's own keyboard application. Fourth, Google's

23

24  _____

25  [1] Snapkeys' initial complaint alleged a trade secrets claim regarding the user interfacing features
    of Snapkeys' keyboard application. ECF No. 1. After Google sent Snapkeys a letter asserting that
    Snapkeys had already publicized Snapkeys' user interfacing features, *see* Graves Decl. Exh. L,
26  Snapkeys dropped its trade secrets claim against Google. *See* ECF No. 13. Snapkeys' breach of
    contract claim is limited to confidential information regarding Snapkeys' keyboard application's
27  underlying coding, software, and/or other technological data and not the keyboard application's
    user interfacing features. TAC ¶¶ 39–43.

28                                        10

1    uncontroverted evidence establishes that: (1) only Clement Wright ("Wright"), a Product Manager

2    for Google's Android Wear Team, saw the two smartwatches; and (2) Wright, who is not a

3    software engineer, does not have the skills or training to read or write software code and does not

4    know how to access the code underlying Snapkeys' keyboard application. Fifth, Snapkeys has

5    presented no evidence that Google accessed Snapkeys' code, used Snapkeys' code for Google's

6    own software application, or shared Snapkeys' code with a third party. The Court addresses each

7    reason in turn.

8         First, Snapkeys waived the argument that Google misused the code underlying Snapkeys'

9    keyboard application by failing to raise this argument in Snapkeys' opposition to the instant

10   motion for summary judgment. "When a non-moving party opposes summary judgment with

11   respect to some claims, but not others, 'a court may, when appropriate, infer from a party's partial

12   opposition that relevant claims or defenses that are not defended have been abandoned." *Marentes*

13   *v. State Farm Mut. Auto. Ins. Co.*, 224 F. Supp. 3d 891, 919 (N.D. Cal. 2016) (quotation omitted).

14   In the instant case, Google contended that Snapkeys had not created a genuine issue of material

15   fact on the theory that Google breached the NDA by misusing the code underlying Snapkeys'

16   keyboard application. Mot. at 14–17. Snapkeys' opposition does not address this argument and

17   instead only addresses the argument that Google breached the NDA by discarding the two

18   smartwatches. Opp'n at 3–5. Accordingly, Snapkeys has waived the argument that Google

19   misused the code underlying Snapkeys' keyboard application. *See Sahadi v. Liberty Mut. Ins.*,

20   2019 WL 4417675, at *9 (N.D. Cal. Sept. 16, 2019) (granting summary judgment to the defendant

21   because the plaintiff "fails to respond to" the defendant's argument and has accordingly "waived

22   any argument" on that point); *see also Recycle for Change v. City of Oakland*, 856 F.3d 666, 673

23   (9th Cir. 2017) (holding that an argument not developed in a party's briefs had been waived).

24        Second, Snapkeys' own evidence establishes that the code underlying Snapkeys' keyboard

25   application was encrypted, which prevented Google from accessing it. Indeed, Snapkeys' former

26   Chief Technology Officer, who wrote the majority of the code for Snapkeys' keyboard

27   application, testified that the code underlying Snapkeys' keyboard application was encrypted and

28

11

United States District Court
Northern District of California

1    required a password. *See* Graves Decl. Exh. J at 26:6–16, 33:21–34:1, 39:3 –8, 41:6–42:13

2    (deposition of Cantor) (stating Snapkeys' code is "encrypted" and "in order to read it, I need the

3    password"). Snapkeys has not presented evidence that Google had the password or could subvert

4    Snapkeys' encryption. *Id.* at 42:14 –18 (deposition of Cantor) ("Q. Has Snapkeys ever . . . shared

5    the encryption key with any third parties? A. I think it [has] not. For third parties for sure not.

6    Never shared."). Indeed, Snapkeys' opposition to Google's motion for summary judgment is silent

7    on the fact that Snapkeys' code is encrypted and that Google simply could not access it.

8    Accordingly, Snapkeys has not created a genuine issue of material fact on whether Google

9    accessed the code underlying Snapkeys' keyboard application.

10        Third, as to Snapkeys' allegations that Google used Snapkeys' code for Google's own

11    keyboard application, Google presents uncontroverted evidence that Google independently created

12    its own keyboard application. Under California law, "[e]ven where the plaintiffs raise an inference

13    of use . . . the defendants may dispel that inference with evidence that conclusively demonstrates

14    the defendants independently created their product." *Spinner v. Am. Broadcasting Cos.*, 215 Cal.

15    App. 4th 172, 185 (2013) (affirming grant of summary judgment based on evidence of

16    independent creation); *see also Morawski v. Lightstorm Entm't, Inc.*, 2013 WL 12081818, at *5

17    (C.D. Cal. Jan. 31, 2013) ("Evidence that defendants independently created [their film] can rebut

18    an inference of use as a matter of law.").

19        In the instant case, Snapkeys' Third Amended Complaint alleges that Google accessed the

20    code underlying Snapkeys' keyboard application and used it for Google's keyboard application.

21    TAC ¶ 40. However, even assuming that Snapkeys has raised an inference of use, Google has

22    provided uncontroverted evidence to rebut any inference of use. Specifically, Google employees

23    began working on Google's own keyboard in 2014 and released Google's keyboard application for

24    internal testing by August 28, 2015, months before Wright received the smartwatches from

25    Snapkeys in October and November 2015. Blume Decl. ¶ 3; Ou Decl. ¶ 9; Ouyang Decl. ¶ 10.

26    This timing suggests that Google independently created its keyboard. *See Mann v. Columbia*

27    *Pictures*, 128 Cal. App. 3d 628, 644 –45 (1982) (concluding that the defendant had independently

28

12

Case No. 19-CV-02658-LHK
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

created the work where the defendant's screenwriter had developed and submitted the screenplay before the plaintiff's screenplay was received).

Furthermore, Google employees based the code for Google's keyboard application for smartwatches on the code for Google's pre-existing keyboard for phones. Wright Decl. ¶ 21; Blume Decl. ¶ 3; Renouf Decl. ¶¶ 5–6; Ouyang Decl. ¶ 7; Ou Decl. ¶¶ 5, 8. The fact that Google's smartwatch keyboard application was based on its prior keyboard also suggests that Google independently created its smartwatch keyboard application. *See John L. Perry Studio, Inc. v. Wernick*, 597 F.2d 1308, 1310 n.2 (9th Cir. 1979) (affirming determination that bird sculptures were independently created because "[t]he accused bird shows characteristics similar to other birds created earlier by Williams, thus suggesting a 'common heritage'"); *Morawski*, 2013 WL 12081818, at *9–*10 (concluding that the defendant had independently created a film because the defendant submitted a detailed affidavit showing how the film was drawn from his prior work).

Moreover, Google engineers who worked on the code for Google's keyboard application for smartwatches never saw the two smartwatches. Wright Decl. ¶ 37; Blume Decl. ¶¶ 5–6; Ouyang Decl. ¶ 16–17; Ou Decl. ¶¶ 11–12; Renouf Decl. ¶¶ 9–10. The fact that the Google engineers never saw the two smartwatches also supports the conclusion that Google independently created its keyboard. *See Mann*, 128 Cal. App. 3d at 642, 650 (concluding that the defendant had independently created the work where there was no evidence that the defendant's screenwriters had seen the plaintiff's script).

In sum, Google presents undisputed evidence of independent creation. Where the defendant "has successfully shown undisputed evidence of independent creation," the plaintiff must produce "evidence that calls into question the evidence supporting independent creation" to avoid summary judgment. *Hollywood Screentest of Am., Inc. v. NBC Universal, Inc.*, 151 Cal. App. 4th 631, 648 (2007); *accord Morawski*, 2013 WL 12081818, at *9 (granting summary judgment to the defendant where the plaintiff had not adduced evidence that called into question the evidence of independent creation). Snapkeys does not present evidence contradicting Google's evidence of independent creation. Accordingly, Snapkeys has not created a genuine issue of

Case No. 19-CV-02658-LHK
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

material fact on whether Google used the code underlying Snapkeys' keyboard application for Google's own keyboard.

Fourth, Google's uncontroverted evidence establishes that (1) only Wright saw the two smartwatches; and (2) Wright, who is not a software engineer, does not have the skills or training to read or write software code and does not know how to access the code underlying Snapkeys' keyboard application. Indeed, Wright treated the smartwatches as confidential and did not share the smartwatches with any other Google employees, including Google engineers. Wright Decl. ¶ 37 ("I was the only person who ever used or saw the watches . . . I stored them 'under my desk in a secure bin that was available only to me.'"); Exh. 1 at 43:9–14 (deposition of Wright).

Snapkeys presents no evidence that Google employees other than Wright saw Snapkeys' prototypes. *See* Graves Decl. Exh. A at 123:13 –22 (deposition of Ryan Ghassabian) ("Q. Mr. Ghassabian, you don't personally claim to have eye witness knowledge yourself that Mr. Clem Wright showed the Snapkeys prototype to any other human being, do you? A. I don't know what he did with the technology or the prototype.").

Moreover, Wright stated that Wright merely used Snapkeys' keyboard application as a consumer would, and Wright "never attempted to reverse engineer, decompile, or otherwise extract any software files, source code, object code, or other data that may have been installed on the watches." Wright Decl. ¶ 36. Wright further stated that, even if Wright had attempted to do this, Wright is not an engineer and does not have the technical capacity to access the code underlying Snapkeys' keyboard application. *Id*. ("I am not a software engineer and did not possess the knowledge to 'reverse engineer' any data 'within' the watches."); *see also id*. ¶ 5 ("I am not a software engineer and do not have the skills or training to read or write software code at a professional level.").

Snapkeys does not present evidence that Wright had the capacity to access the code underlying Snapkeys' keyboard application. Thus, Snapkeys has not created a genuine issue of material fact on whether Wright or another Google employee accessed the code underlying Snapkeys' keyboard application.

14

United States District Court
Northern District of California

1    Finally, Snapkeys presents no evidence that Google accessed Snapkeys' code, used

2    Snapkeys' code for Google's own keyboard application, or shared Snapkeys' code with a third

3    party. Snapkeys' own employees testified in their depositions that they did not have evidence to

4    support these allegations. For example, Anavian testified that he did not have any evidence or

5    know anyone that had evidence that Google misused any information that originated from

6    Snapkeys. *See* Graves Decl. Exh. I at 54:4–15 (deposition of Anavian) ("Do you personally claim

7    to have any facts that Google misused any information that originated from Snapkeys? . . . The

8    Witness: No."). Anavian testified that he did not have any evidence that Google disclosed

9    Snapkeys' information to a third party. *Id*. at 54:16–20. Similarly, Ryan Ghassabian testified in his

10   deposition that Snapkeys did not have any evidence of the accusation that Google shared

11   Snapkeys' confidential information with a third party. *See* Graves Decl. Exh. A at 29:18 –30:3

12   (deposition of Ryan Ghassabian) ("Q. You say 'maybe.' I want to be clear. You have no evidence

13   of that accusation, do you? A. We don't have any evidence."). Snapkeys does not present any

14   evidence of its allegations. Accordingly, Snapkeys has not created a genuine issue of material fact

15   on whether Google accessed the code underlying Snapkeys' keyboard application.

16       For the five reasons set forth above, the Court concludes that Snapkeys has not created a

17   genuine issue of material fact on whether Google accessed the code underlying Snapkeys'

18   keyboard application and used it for Google's own keyboard. The Court thus GRANTS summary

19   judgment to Google on this theory.

20       **2.  Secure Discarding of the Smartwatches**

21       Snapkeys contends that Google breached the NDA by destroying or discarding the two

22   smartwatches given to Wright by Snapkeys. Opp'n at 4–6. Google contends that Google is entitled

23   to summary judgment on this theory. Mot. at 17–18. The Court first examines the facts established

24   by the parties regarding Google's alleged destruction or discarding of the two smartwatches. The

25   Court then discusses whether those facts would constitute a violation of the NDA. Because the

26   Court agrees with Google that securely discarding the smartwatches would not constitute a

27   violation of the NDA, the Court concludes that Google is entitled to summary judgment on this

28
15

1    theory.

2         Snapkeys provided Wright with one smartwatch in October 2015 and another smartwatch

3    in November 2015. Wright Decl. ¶¶ 28–32; Graves Decl. Exh. A at 37:9–17 (deposition of R.

4    Ghassabian); Exh. I at 105:22–106:6 (deposition of Anavian). Wright stated that he was not sure

5    whether the smartwatches were confidential, but Wright treated them as if they were. Wright Decl.

6    ¶ 37, Exh. 1 at 43:9–14 (deposition of Wright).  In July 2016, Snapkeys sent Wright an updated

7    version of Snapkeys' keyboard application. Wright Decl. ¶¶ 28–29. Because Wright had an

8    updated version of Snapkeys' keyboard application, Wright then discarded the two smartwatches

9    with older versions of Snapkeys' keyboard application by placing the smartwatches into a secure

10   e-waste bin for shredding, which was his department's practice for handling product samples that

11   were no longer relevant. *Id*. ¶¶ 43–44. The smartwatches were securely shredded. Sheff Decl. ¶ 3,

12   Exh. 1.

13        The parties dispute whether securely discarding the smartwatches was a violation of the

14   NDA. Mot. at 17–18; Opp'n at 5–6. The NDA stated that the recipient of confidential information

15   "may use Confidential Information only" "to facilitate technical discussions concerning existing or

16   future product development efforts by the parties." Kizzia Decl. Exh. A. The NDA further stated

17   that the recipient of confidential information "must use a reasonable degree of care to protect

18   Confidential Information and to prevent any unauthorized use or disclosure of Confidential

19   Information." *Id*. The NDA did not require that the Confidential Information, or the medium by

20   which it was transported, be returned. *Id.*

21        Securely discarding the smartwatches did not violate these provisions of the NDA. By

22   securely discarding the smartwatches, Wright did "use a reasonable degree of care to protect

23   Confidential Information and to prevent any unauthorized use or disclosure of Confidential

24   Information." *Id*. Indeed, securely discarding the smartwatches ensured that the confidential

25   information within them was not disclosed to anyone. *See* Wright Decl. ¶¶ 43–44 (stating that the

26   smartwatches were placed into an e-waste bin for secure shredding); Sheff Decl. ¶ 3, Exh. 1

27   (Google's agreement regarding waste disposal). Accordingly, securely discarding the

28

Case No. 19-CV-02658-LHK
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    smartwatches did not violate the NDA.

2        Snapkeys contends that securely discarding the smartwatches violated the provision of the

3    NDA that requires the recipient of confidential information to "use a reasonable degree of care to

4    protect Confidential Information and to prevent any unauthorized use or disclosure of Confidential

5    Information." Kizzia Decl. Exh. A. In making this argument, Snapkeys relies on a dictionary

6    definition of the term "protect," which is defined as "to cover or shield from exposure, injury,

7    damage, or destruction." Opp'n at 4. However, there are two problems with Snapkeys' argument.

8        First, the Court need not construct a word in a contract according to its dictionary

9    definition if that definition ignores the context in which a word is used. *See MacKinnon v. Truck*

10   *Ins. Exchange*, 31 Cal. 4th 635, 649 (2003) ("Although examination of various dictionary

11   definitions of a word will no doubt be useful, such examination does not necessarily yield the

12   'ordinary and popular' sense of the word if it disregards the [insurance] policy's context."). In the

13   instant case, the NDA states that recipients of confidential information "must use a reasonable

14   degree of care to protect Confidential Information and to prevent any unauthorized use or

15   disclosure of Confidential Information." Kizzia Decl. Exh. A. The phrase after the term "protect"

16   clarifies that "protecting" confidential information involves "prevent[ing] any unauthorized use or

17   disclosure." *Id*. Wright did that when he kept the smartwatches in a secure bin that only he

18   accessed and later discarded the smartwatches in a secure bin for shredding.

19       Second, Snapkeys alleges that Google did not protect confidential information because

20   Wright securely discarded the smartwatches. However, the verb "protect" modifies "Confidential

21   Information," not the smartwatches. Kizzia Decl. Exh. A. Snapkeys presents no evidence that

22   Wright destroyed Snapkeys' confidential information when Wright securely discarded the

23   smartwatches. Indeed, the smartwatches did not contain Snapkeys' only copy of Snapkeys'

24   keyboard application. *See* Graves Decl. Exh. B at 39:20–41:20 (deposition of Benjamin

25   Ghassabian) (stating that Snapkeys' code was stored for Snapkeys' employees); Graves Decl. Exh.

26   J. at 35:18–23 (deposition of Cantor) (stating that Snapkeys employees had access to Snapkeys'

27   source code). Thus, even if the Court were to accept Snapkeys' definition, Snapkeys has not

28
        17

1    shown that Google did not protect confidential information.

2         Snapkeys relies on other provisions of the parties' NDA to support its argument.

3    Specifically, Snapkeys relies on a provision that establishes that "Recipient's duty to protect

4    Confidential Information expires five years from disclosure." Kizzia Decl. Exh. A. According to

5    Snapkeys, this provision prevented Google from discarding the smartwatches within five years

6    after receiving them. Opp'n at 5. The Court disagrees. As explained above, securely discarding the

7    smartwatches was not a violation of Google's duty to protect confidential information. Thus,

8    Google did not have to wait five years before securely discarding the smartwatches.

9         In sum, securely discarding the smartwatches did not violate the parties' NDA because the

10   NDA did not require return of the confidential information, or the medium by which it was

11   transported. Kizzia Decl. Exh. A. In the instant case, if the Court were to conclude that securely

12   discarding the smartwatches violated the NDA, the Court would necessarily be adding an

13   additional term requiring return of the medium by which confidential information was transported,

14   which the Court cannot do. *See Dameron Hosp. Ass'n v. AAA N. Cal., Nev. & Utah Ins. Exch.*, 229

15   Cal. App. 4th 549, 569–70 (2014) ("We do not have the power to create for the parties a contract

16   that they did not make and cannot insert language that one party now wishes were there.")

17   (quotation omitted). Therefore, the Court GRANTS summary judgment to Google on the breach

18   of contract claim.

19        **B.  Conversion**

20        Snapkeys additionally brings a conversion claim against Google. "Under California law,

21   '[t]he elements of a conversion claim are (1) the plaintiff's ownership or right to possession of the

22   property at the time of the conversion; (2) the defendant's conversion by a wrongful act or

23   disposition of property rights; and (3) damages.'" *Mission Produce, Inc. v. Organic All., Inc.*,

24   2016 WL 1161988, at *8 (N.D. Cal. Mar. 24, 2016) (quoting *Mindys Cosmetics, Inc. v. Dakar*,

25   611 F.3d 590, 601 (9th Cir. 2010)). In the instant case, Google contends that Snapkeys has not

26   created a genuine issue of material fact on any of these three elements. Mot. at 18–22. The Court

27   addresses each element in turn.

28

Case No. 19-CV-02658-LHK
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.  Ownership or Right to the Property

The first element of a conversion claim is the plaintiff's ownership or right to possession of the property at the time of the conversion. *Mission Produce, Inc.*, 2016 WL 1161988, at *8. "[M]erely alleging ownership of [the allegedly converted property] is insufficient to establish conversion." *Finton Construction, Inc., v. Bidna & Keys, APLC*, 238 Cal. App. 4th 200, 213 (2015). The plaintiff cannot establish the ownership of the allegedly converted property where the status of the property is disputed. *Id*. at 213–14 (dismissing conversion claim because "it is far from clear that [the defendant] did not have a right equal to that of [the plaintiffs] in terms of access to or copying of" the allegedly converted records and "[a]t best, the status of the property continues to be disputed").

In the instant case, Snapkeys gave the smartwatches to Google without stating that they remained Snapkeys' property or that Snapkeys expected them back. Both Ryan Ghassabian and Anavian testified in their depositions that, during their November 2015 meeting with Wright, neither Ghassabian nor Anavian told Wright that Google needed to return the smartwatches to Snapkeys. *See* Graves Decl. Exh. A at 37:9–17 (deposition of Ghassabian) ("Q. When you helped deliver the two prototypes to Google, you didn't ask Mr. Wright to return them to SnapKeys when he was finished with them, did you? A. I didn't tell them he could keep them. Q. Okay. You didn't say either way, did you? A. That discussion never came up."); Exh. I at 105:22–106:6 ("Q. Now, during the meeting in November that you attended with Mr. Wright and Mr. Ghassabian, you left the prototype with Mr. Wright at that meeting, correct? A. Correct. Q. Okay. And you didn't tell him, 'You need to give this back to us,' correct? A. No, I didn't. Q. And neither did Mr. Ghassabian? A. I don't remember, but I'm sure he didn't.").

Moreover, when Snapkeys sent Wright a new version of the keyboard application, Snapkeys did not ask Wright to send the two smartwatches back. *See* Graves Decl. Exh. A at 60:12–17 (deposition of Ryan Ghassabian) ("Q. . . When SnapKeys sent Mr. Wright an APK for the newer version of its prototype roughly around July of 2016, you didn't ask Mr. Wright to send you back the two older prototypes at that point in time, did you? A. We did not."). Snapkeys does

19

1  not present any evidence that Snapkeys told Google that Google needed to return the smartwatches

2  until November 2016, approximately one year after Google received the smartwatches, when

3  Snapkeys sent a letter to Google demanding the return of the smartwatches. Wright Decl. ¶ 46,

4  Exh. 24; Kizzia Decl. Exh. D.

5        Based on these facts, the Court concludes that Snapkeys has not created a genuine issue of

6  material fact as to whether Snapkeys retained ownership or a right to possession of the

7  smartwatches. Rather, the undisputed evidence shows that Snapkeys gave the smartwatches to

8  Google as product samples in order to promote Snapkeys' keyboard application. Accordingly,

9  Snapkeys has not created a genuine issue of material fact on whether Snapkeys retained ownership

10  or a right to possession of the smartwatches. *See Finton Construction, Inc.*, 238 Cal. App. 4th at

11  213–14 (concluding that ownership element of conversion was not established because "[a]t best,

12  the status of the property continues to be disputed").

13        In contending that Snapkeys had ownership of the smartwatches, Snapkeys relies on a

14  provision of the NDA that states that "[n]o party acquires any intellectual property rights under

15  this agreement except the limited rights necessary to use the Confidential Information" "to

16  facilitate technical discussions concerning existing or future product development efforts by the

17  parties." Kizzia Decl. Exh. A. However, this provision is inapposite because it pertains to

18  intellectual property rights, such as the code underlying Snapkeys' keyboard application, rather

19  than the smartwatches themselves, which are the subject of Snapkeys' conversion claim, as this

20  Court's Order on Google's motion to dismiss explained. *See* ECF No. 54 at 12 (concluding that

21  "Snapkeys' conversion claim survives only insofar as Snapkeys seeks recovery for the value of its

22  tangible physical property, rather than the value of the trade secrets or any other confidential

23  information in those prototypes"). Accordingly, Snapkeys has not created a genuine issue of

24  material fact on whether Snapkeys retained ownership or a right to possession of the

25  smartwatches.

26      **2.  Conversion by a Wrongful Act or Disposition of Property Rights**

27        The second element of a conversion claim is the defendant's conversion by a wrongful act

28

20

Case No. 19-CV-02658-LHK
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    or disposition of property rights. *Mission Produce, Inc.*, 2016 WL 1161988, at \*8. "Not every

2    failure to deliver property to the rightful owner constitutes a conversion." *Spates v. Dameon Hosp.*

3    *Ass'n*, 114 Cal. App. 4th 208, 222 (2003). Rather, conversion requires that the plaintiff "prove that

4    the defendant wrongfully obtained possession over a specific piece of property." *Firoozye v.*

5    *Earthlink Network*, 153 F. Supp. 2d 1115, 1130 (N.D. Cal. July 31, 2001).

6        In the instant case, Snapkeys contends that securely discarding the smartwatches was

7    wrongful because it violated the NDA. Opp'n at 8–9. However, Snapkeys has not established that

8    securely discarding the smartwatches was wrongful under the parties' NDA for the reasons

9    explained above. *See* Section III(A)(2), *supra*. Moreover, Snapkeys does not contend or establish

10    that securely discarding the smartwatches was wrongful outside the context of the NDA. Thus,

11    Snapkeys has not created a genuine issue of material fact on this element.

12    **3. Damages**

13        Finally, a plaintiff bringing a conversion claim must show damages. *Mission Produce, Inc.*,

14    2016 WL 1161988, at \*8. "To recover in tort, the plaintiff must prove the fact of proximately

15    caused injury with reasonable certainty." *Leuter v. State of California*, 94 Cal. App. 4th 1285,

16    1303 (2002) (concluding that the plaintiff was not entitled to damages based on "the mere

17    possibility" that a tire fragment "discarded by defendants might have been usable evidence" in a

18    personal injury lawsuit). Where the plaintiff "has not identified any evidence in the record of any

19    damages associated with the conduct alleged," the defendant is entitled to summary judgment.

20    *Luxul Tech., Inc. v. NectarLux, LLC*, 2016 WL 3345464, at \*12 (N.D. Cal. June 16, 2016).

21        In the instant case, Snapkeys has not identified any evidence in the record of any damages

22    associated with Google securely discarding the smartwatches. Snapkeys could have presented

23    evidence that, had Google returned the smartwatches, the smartwatches would have had remaining

24    market value or some value to Snapkeys. However, Snapkeys does not present evidence

25    demonstrating any remaining market value or value to Snapkeys. For example, Snapkeys does not

26    show that the two smartwatches were going to be sent to another third party for promotional

27    purposes. Indeed, Ryan Ghassabian testified in his deposition that Snapkeys did not give out

28

United States District Court
Northern District of California

Case No. 19-CV-02658-LHK
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

1    copies of the two versions of Snapkeys' keyboard application after July 2016, when Wright

2    received the third version of Snapkeys' keyboard application. *See* Graves Decl. Exh. A at 79:15–

3    24 (deposition of Ryan Ghassabian) ("Q. . . I take it, then, that Snapkeys didn't give out copies of

4    the first or second prototypes that Mr. Wright received at any point in time after early July of

5    2016; is that fair? A. We didn't deliver any prototypes, to my knowledge, after July 2016 to any

6    third parties. Q. Okay. And it wasn't a situation where somebody wanted one or was asking for

7    one and for whatever reason they didn't get it? A. No.").

8    Snapkeys speculates that, had Google returned the smartwatches to Snapkeys, Snapkeys

9    could have examined the smartwatches to determine how Wright used the smartwatches. *See*

10   Graves Decl. Exh. K ("Snapkeys is unable to examine the prototypes to determine precisely how,

11   when, or with what Google used and/or inspected Snapkeys' prototypes because Google discared

12   or destroyed those prototypes."). However, Snapkeys' former Chief Technology Officer testified

13   in his deposition that Snapkeys could not have determined how Wright used the smartwatches had

14   they been returned. *See* Graves Decl. Exh. J at 49:25–50:19 (deposition of Cantor) ("Q. . . . Is it

15   true that Snapkeys has never sent an Android Wear watch with its keyboard installed to a third

16   party, then received it back from the third party and then examined how that third party used the

17   watch? Is that true? A. I'm not aware about such cases . . . I can't even understand the reason

18   because of how can [we] restore how the watch was used and how the program was used? . . .

19   [E]ven if we have – if we could get . . . any device back from somebody, I don't see a way how we

20   can restore what was done with the program which is stored from the device and how it was

21   used."). Moreover, Snapkeys never presents evidence establishing that determining how Wright

22   used the smartwatches would have had value to Snapkeys. *See Leuter*, 94 Cal. App. 4th at 1303

23   (concluding that the plaintiff could not prove injury where there was "nothing more than a remote

24   possibility" of the alleged injury). Thus, because Snapkeys "has not identified any evidence in the

25   record of any damages associated with" Google's securely discarding the smartwatches, Google is

26   entitled to summary judgment. *Luxul Tech., Inc.*, 2016 WL 3345464, at *12. Accordingly, the

27   Court GRANTS Google's motion for summary judgment on the conversion claim.

28

Case No. 19-CV-02658-LHK
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Google's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: May 17, 2021

_Lucy H. Koh_
_____
LUCY H. KOH
United States District Judge

Case No. 19-CV-02658-LHK
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT